UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
NETRATINGS, INC.,
                                          :
            Plaintiff,
                                          :
      vs.                                       Civil Action No. 06-cv-3353 (BSJ) (HBP)
                                          :

180SOLUTIONS, INC. and ZANGO, INC.,       :

            Defendants.                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**NETRATINGS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

Seth H. Ostrow (SO 9605)
Arianna Frankl (AF 7764)
Timothy M. Salmon (TS 7348)
**DREIER LLP**
499 Park Avenue
New York, New York 10022
(212) 328-6100

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT .............................................................................1

POINT I

    BACKGROUND ...............................................................................2

    A.   CASE HISTORY ................................................................2

    B.   THE PARTIES....................................................................2

         1.   Plaintiff NetRatings, Inc. ...........................................2

         2.   Defendants 180solutions, Inc. and Zango, Inc..........3

    C.   NETRATINGS' PATENTED INVENTIONS ....................3

         1.   Technology Background ............................................3

         2.   The Coffey Patents ('510 and '680 Patents) ............5

         3.   The Davis Patent ('155 Patent) .................................6

POINT II

    LEGAL STANDARDS FOR CLAIM CONSTRUCTION ................................7

POINT III

    NETRATINGS' PROPOSED CONSTRUCTIONS .................................9

    A.   TERMS FROM THE '510 AND '680 PATENTS ................9

         1.   *local computer use meter/user meter* ......................9

         2.   *log of predetermined [machine operation] events; log; machine operation events; events; logging predetermined events by a plurality of local computer use meters* .....................11

         3.   *installed in user computer machines*........................13

         4.   *stored in memory of said computer machines; stored in an associated user computer machine; storing each of the events in said log in the local computer memory of said user computer systems; storing said log of predetermined events by each use meter in an associated user computer machine; stores said log of predetermined events* ....................................14

         5.   *identify titles of open windows and reflects a log of titles of worldwide web pages; identify titles of windows and worldwide web pages* ...................16

         6.   *identifies character strings reflecting on-line activity* ...............................17

         7.   *dictionary/dictionary file* ........................................18

8.    *transferring said stored events from said plurality of user computer systems to a processing station computer* ....................................................19

9.    *correlates said titles to identifiable labels* .................................19

B.    TERMS FROM THE '155 PATENT ...................................................21

1.    *resource* ......................................................................................21

2.    *executable program;*
      *executable program not being part of the resource* ...................21

3.    *client identifying indicia* .........................................................22

C.    APPLICATION OF 35 U.S.C. § 112(6)
      TO CLAIM 9 OF THE '510 PATENT ...............................................23

CONCLUSION ..............................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002)........................................................................12

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
    438 F.3d 1374 (Fed. Cir. 2006)........................................................................18

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995)......................................................................7, 8, 9

*McKesson Info. Solutions LLC v. The Trizetto Group, Inc.*,
    426 F. Supp. 2d 197 (D. Del. 2006) ........................................................... 23-24

*Novartis Pharms. Corp. v. Apotex Corp.*,
    No. 02 Civ. 8917, 2006 WL 626058 (S.D.N.Y. Mar. 13, 2006) .........................8, 9

*Nystrom v. Trex Co.*, 424 F.3d 1136 (Fed. Cir. 2005) ...................................................13

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
    429 F.3d 1364 (Fed. Cir. 2005)........................................................................19

*Phillips v. AWH Corporation*,
    415 F.3d 1303 (Fed. Cir. 2005)................................................................. *passim*

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001)........................................................................12

*StairMaster Sports/Medical Prods. v. Groupe Procycle, Inc.*,
    Case No. 97-396 MMS, 1998 WL 290296 (D. Del. May 20, 1998) .......................19

*WMS Gaming Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999)........................................................................23

## MISCELLANEOUS

Robert C. Faber, *Landis on Mechanics of Patent Drafting,* § 20
    (Practising Law Institute 3rd ed. 1990).............................................................13

## PRELIMINARY STATEMENT

Plaintiff NetRatings, Inc. ("NetRatings") submits this opening brief in support of its construction of disputed terms from asserted claims of the patents in suit. [1]

NetRatings, in business since 1997, owns a portfolio of key patents covering technology by which companies can, among other things, track and report on how people use the Internet and its resources, such as web pages and advertisements.  Defendants 180solutions, Inc. and Zango, Inc. (collectively referred to herein as "Zango") use the patented technology in the context of targeted Internet advertising by selecting advertisements that correspond to users' online activities and collecting information indicative of the advertisements shown to the users and the users' responsiveness thereto.

The inventions of the patents in suit are claimed using many terms which are common and readily understood in this Internet age.  Nonetheless, Zango insists on requiring the Court to construe such terms in an attempt to avoid infringement by reading limitations from embodiments, or wholly extraneous limitations which have no basis at all in the intrinsic evidence, into the claims. [2]  On the other hand, NetRatings follows the mandate of the Federal Circuit by construing the claims based on the claim language and the intrinsic evidence, as affirmed by relevant dictionary and treatise definitions.  For the reasons more fully explained below, NetRatings' constructions should be the Order of this Court.

---

[1]  The patents in suit are U.S. Patent Nos.: 5,675,510 (the "'510 patent"); 6,115,680 (the "'680 patent"); and 6,138,155 (the "'155 patent").  Each of the patents in suit is annexed as Exhibits A-C to NetRatings, Inc.'s Appendix of Exhibits to the Markman Briefs that will be filed with NetRatings' Responsive Claim Construction Brief (hereinafter references to NetRatings' Appendix will follow the form: "App. Ex. __, at __").

[2]  Zango informed NetRatings (on April 26, 2007) that it did not intend to brief certain terms which it had initially identified as requiring construction and NetRatings believes that Zango is thus waiving its rights to seek construction of such terms.  Based on Zango's assertions, NetRatings is not addressing such terms in this brief.  However, to the extent that Zango either does address such terms in its opening brief or attempts to present them at some later time, NetRatings reserves all rights to respond appropriately at such time.

# POINT I

# BACKGROUND

### A.     Case History

NetRatings filed its complaint on or about May 2, 2006 asserting the '510 and '680 patents. *See* Docket Item ("DI") 1.  By stipulation of the parties, NetRatings amended the Complaint on or about February 13, 2007 to include the '155 patent.  *See* DI 26.  The parties have been engaged in discovery since August 24, 2006 with fact discovery set to close on July 27, 2007.  Pursuant to the Case Management Order entered on October 13, 2006 and amended on February 8, 2007, the parties have exchanged proposed lists of terms and constructions on March 1, 2007 and final and responsive constructions on March 20, 2007.[3]

### B.     The Parties

#### 1.     Plaintiff NetRatings, Inc.

NetRatings is based in New York, New York and Milpitas, California, where it maintains offices, as well as in Oxford, UK and Sydney, Australia.  NetRatings provides Internet and digital media measurement and analysis products and services to clients world-wide in the media, technology, advertising, consumer products, retail and travel industries.  NetRatings' products collect various data including, but not limited to, information regarding web sites visited by users, selection of content (*e.g.,* advertisements) displayed to users, and other information associated with users' web site activities.  The data collected by NetRatings' products provides, among other things, the ability to learn the frequency with which users visit various web sites, the frequency

---

[3] For the Court's benefit, prior claim construction proceedings with respect to the patents in suit have been held in other cases.  In *NetRatings, Inc. v. Coremetrics, Inc.*, 05-314 (D. Del.) briefing and a Markman hearing occurred, but the case settled before a Markman order was issued.  In another case, still pending in this Court, *NetRatings, Inc. v. WebSideStory, Inc.*, 06-878 (LTS) (AJP) (S.D.N.Y.), briefing and a Markman hearing have occurred (the hearing on February 1, 2007) and the Honorable Laura T. Swain has taken the matter under advisement.  As of the date of this brief, no Markman order has issued.

with which advertisements from various advertising campaigns are selected by users, and details regarding Internet user preferences.

        **2.**        **Defendants 180solutions, Inc. and Zango, Inc.**

Zango provides users with software that may be downloaded directly from Zango or may be bundled with software or applications provided by third parties.  Zango web site at http://www.zangocash.com/programs/software.html, attached as Ex. 1 to the Declaration of Timothy M. Salmon dated April 27, 2007 (hereinafter "Salmon Decl. Ex. __").  The Zango software collects various information about users' browsing behaviors including, but not limited to, search terms entered and an IP address of the user's computer.  Zango web page at http://www.zango.com/Destination/Corporate/PrivacyPolicy.aspx, Salmon Decl. Ex. 2.  The Zango software transmits this information in a request to Zango servers, which utilize the information to select advertisements that will be served to the user.  A request for an advertisement includes information such as a URL of the web page and/or the search terms entered.  The Zango servers can analyze the users' browsing behaviors and their responsiveness to the advertisements, allowing advertisers to track campaign progress and effectiveness.  Zango web page at http://adservices.zango.com/PL/ProductAndServices.aspx, Salmon Decl. Ex. 3.

**C.**      **NetRatings' Patented Inventions**

        **1.**        **Technology Background**

In computer networks such as the Internet, individual computer users use their computers (which may also be referred to as "client" computers) to access various types of resources on the network.  These resources, examples of which are commonly known (such as web pages, games, ad banners, *etc.*), are sometimes also referred to as "content."  In the context of the web, resources generally consist of or are contained within HTML documents, which are stored on servers located at content provider sites (*e.g.,* servers operated for a retail store like Sears) and consist of

text and references to other resources, or content, from different locations on the web. *See, e.g.,* '155 patent, col. 7, ll. 6-35.

With the rapid expansion of the use of personal computers during the early 1990s, the desire to measure the use of computer related resources and the dissemination of electronic information increased significantly. *See*, *e.g.,* '510 patent, col. 1, ll. 10-33.  However, until the inventions described in the patents in suit, information regarding such use was only collected at the server side -- the location of the server computer which received the requests for content.  This server side data collection method had serious disadvantages.  For example, it did not (and still cannot) provide information about what was occurring at the client computer (or "client side") after the content left the server.  For instance, the server computer, while capable of recording every request it receives from multiple client computers, cannot record requests made by the same client computers to other server computers.

The numerous, significant inventions claimed in NetRatings' patents solved these and other problems associated with the prior art.  The inventions of the '510 and '680 patents provided the breakthrough technology of putting software on the client computer to monitor what Internet users were doing on the web.  Through the inventions of the '510 and '680 patents, it is now possible to determine which web sites multiple Internet users are going to and which web sites individual Internet users have been to.  With the invention of the '155 patent (along with other patents owned by NetRatings), additional ways of obtaining the monitoring software were identified and the collection of specific details regarding Internet users' use and interaction with resources, such as web pages, was enabled.  One benefit of collecting these details is the ability to provide custom or targeted content to users based on their interests and preferences. *See* '155 patent, col. 5, ll. 1-7.

4

### 2.       The Coffey Patents ('510 and '680 Patents)

The '510 and '680 patents relate to monitoring – at client computers – what individuals are doing on their computers and analyzing and reporting on the collected data.  *See* '510 patent, col. 1, ll. 5-8; col. 2, ll. 12-50.  This is accomplished with software located on the client computer that captures data identifying the software applications and resources, such as web pages, the user is accessing.  *See, e.g.,* '510 patent, col. 1, ll. 22-23, 36-44; col. 2, ll. 21-50.   Collected data is transmitted from the individual client computers to a central processing location, where the information from many individual client computers may be processed, translated, analyzed and reported on.  *See, e.g.,* '510 patent, col. 2, ll. 62-67.  The collected data identifies or describes, for example, titles of web pages or other strings of characters reflecting on-line activity.[4]  *See, e.g.,* '510 patent, col. 4, ll. 12-24; col. 2, ll. 35-50.

In one embodiment, as shown in Figure 1 from the '510 and '680 patents reproduced below, a meter (1) installed on a personal computer, logs events occurring at that computer, such as a user's accessing a web page, and transmits (at 2) the data (11) to a central processing station.  The central processing station collects data from multiple separate personal computers and loads the data into a database (13).  A data dictionary (14) interprets the data and the interpreted data is used to generate reports (at 6) showing information derived from the data.  Accordingly, the web usage activity from multiple individual users is collected and reports can be provided that show information such as how many different people went to a particular web site or the different web sites a specific user visited.

---

[4]  URLs, or Uniform Resource Locators, identify locations on the Web from which data or a computer program may be downloaded.  An example URL is http://www1.nysd.uscourts.gov/index.php.



*Fig. 1*

Fig. 1, '510 and '680 patents.

### 3.      The Davis Patent ('155 Patent)

The '155 patent builds on the core data collection mechanisms provided in the '510 and '680 patents by describing techniques for alternative delivery of monitoring programs to users and for monitoring details of individuals' uses of resources such as web pages.  *See, e.g.,* '155 patent, col. 1, ll. 12-17.  In some embodiments, a tracking program for collecting data regarding the use of the resource is downloaded from a server on the network different from the server that provided the resource.  *See, e.g.,* '155 patent, claim 1.  The server that provides the computer tracking program in this latter example can be dedicated to providing the program to multiple client

6

computers.  This may be beneficial in permitting, among other things, changes to be made to the program at the one server rather than at all the different client computers.

As described in the '155 patent, the type of data collected includes data about the use of a resource as well as data that enables an association to be made between the use data and the client computer (or user computer) on which the use occurred.  *See, e.g.,* '155 patent, col. 5, ll. 1-7.  A database of information can then be created using collected data that includes information about users who have visited a web site and information about such users' uses of the web site, such as the different web pages on the web site the user visited and in what order.  The information in the database can be analyzed to determine individual user interests and preferences.  *See* '155 patent, col. 12, l. 58 – col. 13, l. 24.

## POINT II

## <u>LEGAL STANDARDS FOR CLAIM CONSTRUCTION</u>

The basic standards for construing patent claims are well known.  The Court determines the meaning of pertinent claim language to establish the scope of the patent's claims for purposes of determining questions of infringement and validity.  *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 978-79 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  In its most recent *en banc* pronouncement concerning claim construction, *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit reaffirmed and clarified the governing principles of claim construction.

"[T]he words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question "as of the effective filing date of the patent application."  *Phillips,* 415 F.3d at 1312-13.  The person of skill in the art is "deemed to read the claim term not only in the context of the particular claim in which the

disputed term appears, but in the context of the entire patent, including the specification."
*Phillips*, 415 F.3d at 1313.  Where the ordinary meaning of claim language is readily apparent, as it is here with respect to most disputed terms, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips,* 415 F.3d at 1314.  In such a case, "general purpose dictionaries may be helpful." *Id*.  Where the meaning of terms is not clear, Courts may look to sources available to the public that will help determine how a person of skill in the art would, as of the effective filing date, understand the disputed claim language.  *Phillips,* 415 F.3d at 1314.

The Court should look to the claim language in which the disputed term appears and may also consider other claims of the patent (whether asserted or not).  *Id.* at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'").  Similarities and differences among claims may be instructive.  *Id.* at 1314-15.  For example, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315.

The claims should be read in view of, and be consistent with, the specification of the patent. If the patentee clearly defined a disputed term in the specification, that construction should govern. *Id.* at 1316.  At the same time, as *Phillips* reiterates, courts must avoid reading limitations from the specification into the claims.  *Id.* at 1323; *Novartis Pharms. Corp. v. Apotex Corp.*, No. 02 Civ. 8917, 2006 WL 626058, at *4 (S.D.N.Y. Mar. 13, 2006) (declining to import limitations from specification).  *See also Phillips,* 415 F.3d at 1312 ("'The written description part of the specification itself does not delimit the right to exclude.  That is the function and purpose of claims.'") (*citing Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en

banc), *aff'd*, 517 U.S. 370 (1996)).  Although a specification often describes specific embodiments of the invention, or only one embodiment, claims are not to be limited to the described embodiments.  *Phillips,* 415 F.3d at 1323.

The Court may also consider the prosecution history of the patent, if in evidence.  *Phillips* at 1317.  Still, the prosecution history reflects an "ongoing negotiation" between the applicant and the patent office, and thus, is often "less useful for claim construction purposes."  *Id.*; *Novartis Pharms. Corp.,* 2006 WL 626058, at *3.

The Court may also consider extrinsic evidence (all evidence other than the patent and prosecution history), but such evidence is less significant in determining the meaning of claims and should be considered in view of the intrinsic evidence.  *Phillips* at 1317-18; *Novartis*, 2006 WL 626058, at *3.  NetRatings applies these principles in its constructions.

**POINT III**

**NETRATINGS' PROPOSED CONSTRUCTIONS**

**A.      Terms From the '510 and '680 Patents**

> **1.      *local computer use meter/user meter***

As discussed above, the inventions of '510 and '680 patents include a software program at the client computer which collects information about user computer activity.  Asserted independent claim 1 in the '510 and '680 patents, as well as independent claim 12 in the '680 patent refer to this software program as a "local computer use meter."[5]  The proper construction of "local computer use meter" (and "user meter") is "a software program designed to collect information regarding the use of other software programs on a computer on which the software program is installed."

---

[5]  Asserted dependent claim 3 of the '680 patent contains the term "user meter" which refers to the "local computer use meter" of independent claim 1 and should accordingly be construed in the same manner as the "local computer use meter."  *See, e.g.,* claim 3 ("wherein said each user meter…").

The intrinsic evidence fully supports NetRatings' construction.  For example, the specification refers to the 'meter' as software (*e.g.,* a software application).  *See, e.g.,* '510 patent, col. 2, ll. 21-22, 36-38; '680 patent, col. 2, ll. 28-30, 42-44 (referring to a "meter application").  *See also* App. Ex. I, at A1174-1178 ('510 Patent, Response Under 37 C.F.R. §1.111 dated Dec. 26, 1996, at 3) (explaining that a "computer use meter **in the form of a software module** is installed on personal computers") (emphasis supplied).  The use of the term "local" indicates that the meter is designed to collect information regarding the use of software on a computer on which the software program is installed (to be contrasted with collection of information in the first instance at the server or in some other location).  *See, e.g.,* '510 and '680 patents, claim 1 (meter is "installed in user computer machines"); '510 patent, col. 1, ll. 36-38 and 44-46; col. 2, ll. 21-23; col. 5, ll. 6-8.

Zango's proposed construction of the disputed terms is incorrect for at least, failing to account for the word "local" within the claim term.  According to Zango's proposed construction, the meter could be located anywhere.  *See* JCCC row 1.  Zango's construction should also be rejected because it fails to address an important aspect of the invention.  The meters do not just collect information concerning the computer; they collect information concerning the use of *other software programs* being used on the computer.  *See, e.g.,* '510 patent, col. 2, ll. 21-26 ("According to the invention, a meter application installed in a personal computer may log events for top-level Windows for any given application.  Events which are specific to child Windows of an application may not necessarily be logged.  For certain applications, additional detailed event logging for such child Windows will occur.").

For at least the foregoing reasons, NetRatings respectfully requests that the Court construe the terms "local computer use meter" and "user meter" to mean "a software program designed to

collect information regarding the use of other software programs on a computer on which the software program is installed."

2.    *log of predetermined [machine operation] events; log; machine operation events; events*[6]*; logging predetermined events by a plurality of local computer use meters*

As described in the specifications, the meters record data regarding events relating to the "use of personal computer software" and on-line services.  *See, e.g.,* '510 patent, col. 1, ll. 36-44. The types of events for which data is collected are selected in advance to facilitate the collection and provide useful information.  That is, the meter is programmed to collect data about certain events, if and when those events occur.  In accordance with the ordinary meaning and the specifications, the term "log of predetermined [machine operation] events" should thus be construed as "a record of data regarding the occurrence of pre-selected potential events [related to machine operations]."  Additionally, machine operation events are "events relating to operations performed on the computer."

Data regarding events that may be recorded includes, by way of example, "message types such as launch, terminate, switch, minimize, restore," and "date, time, household ID number, individual within the household using the computer," among others.[7]  '510 patent, col. 2, ll. 1-7, 28-33; '680 patent, col. 2, ll. 9-15, 35-40.  *See also* App. Ex. I, at A1174-1178 ('510 Patent, Response Under 37 C.F.R. §1.111 dated 12/26/96, at 3 (explaining that "the computer use meter captures and identifies any world wide web pages which are being used by the user")).  NetRatings'

---

[6]  The phrase "log of predetermined machine operation events" appears in claim 1 of the '510 patent.  The phrase "log of predetermined events" (without being limited to *machine operation* events) appears in claims 1, 4, 10-12, 15, 21 and 22 of the '680 patent.

[7]  Both the '510 and '680 patents illustrate the log entries that may be generated for various events, such as "PANEL," which identifies data regarding the user, "ACTVT," which indicates "that a top level window task is activated," "TSTRT," which indicates "that a top level windows task has started," "MINIM," which indicates "that a top level window has been minimized," and "RESTO," which indicates "that a top level window has either been restored from its iconic states or restored to its original states from a maximized state."  '510 patent, col. 8, ll. 16-30; '680 patent, col. 8, ll. 31-45.

proposed construction is also fully in accord with the ordinary meaning of the words "log" (a record), "predetermined" (decide/determine beforehand) and "events"(an occurrence or happening; action or occurrence to which a program might respond)  *See IBM Dictionary of Computing* (George McDaniel ed., 10th ed. 1993) ("*IBM*"), Salmon Decl. Ex. 4 at 396 [log]; at 247 [event]; *McGraw-Hill Dictionary of Scientific and Technical Terms* (Sybil P. Parker ed., 5th ed. 1994) ("*McGraw-Hill*"), Salmon Decl. Ex. 5 at 1163 [log]; *Webster's II New College Dictionary* (1995) ("*Webster's II*"), Salmon Decl. Ex. 6 at 644 [log], 870 [predetermine]; *The Merriam-Webster Dictionary* (1997) ("*MW*"), Salmon Decl. Ex. 7 at 436 [log], 576 [predetermine]; *Microsoft Press Computer Dictionary* (3rd ed. 1997) ("*Microsoft*"), Salmon Decl. Ex. 8 at 181 [event].

Zango's construction requires that the log be "a file" which "contains a time-sequential record of more than one previously identified internal [operating system] event."  JCCC row 2. While there are examples in the specification of logs which indicate multiple events over time, it would be improper to read these examples or characteristics of these examples into the claim language.  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (accused infringer cannot "narrow a claim term []…simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history"); *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1345 (Fed. Cir. 2001) (rejecting argument that claims should be limited to examples in the specification where patentee made clear that invention was capable of other embodiments).  Further, while the patents sometimes refer to a log "file," they also refer to the log generally, and also an event log.  *See, e.g.,* '510 patent, col. 2, l. 54 (referring to the "data log" and a "log" with no qualifier); col. 2, ll. 58 and 59 (referring to an "event log"); col. 2, l. 64 (referring to "local personal computer use logs").  Nowhere do the patents state that the log must always be in the form of a "file."

12

Additionally, Zango's construction requires that the record of *machine operation* events be limited to "internal operating system event[s]."  While machine operation events may include events associated with operating system events, the claimed "machine operation events" are not limited to such events.  In fact, Zango's proposed construction would violate the doctrine of claim differentiation, because claim 10 of the '510 patent explicitly recites generating a log through the use of "operating system messages."  As stated by the Federal Circuit, "[w]hen different words or phrases are used in separate claims, a difference in meaning is presumed."  *Nystrom v. Trex Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005).  Accordingly, Zango's proposed construction, which equates "machine operation events" with "internal operating system event[s]," should be rejected by the court.

Zango also chose to construe the term "logging predetermined events by a plurality of local computer use meters" which appears in claim 12 of the '680 patent.  Properly construed, this term means "two or more local computer use meters recording data regarding the occurrence of pre-selected potential events."  This construction is fully supported by the specification and the ordinary meaning of the terms in the phrase.  Events and logs are discussed above.  With respect to "a plurality of local computer use meters," a plurality is construed as "two or more."  Robert C. Faber, *Landis on Mechanics of Patent Claim Drafting* § 20 (Practising Law Institute 3rd ed. 1990), (noting that a "plurality" is "used for an indefinite number, two or more").

As NetRatings' constructions of the foregoing disputed terms comply with the mandates of the Federal Circuit, they should be adopted by the Court.

### 3.      *installed in user computer machines*

The meter described in the '510 and '680 patents is "installed in user computer machines" meaning that it is "placed on and ready for use by a user computer."  *See* '510 patent, claim 1; '680 patent, claims 1, 12.  *See also* '510 patent, col. 2, ll. 21-23; '680 patent, col. 2, ll. 28-30 (meter

application is "installed in a personal computer").  Installing the meter on client computers allows the meter to run on the client computer and collect data about locally occurring events, as opposed to being installed on server computers or elsewhere.

NetRatings' construction is consistent with the specifications as well as the ordinary meaning of the word "install," which focuses on something being set in place and made ready for use.  *See MW* at 390 [install] (to set up for use or service); *Webster's II* at 574 [install] (to set in position or adjust for use).  *See also McGraw-Hill* at 1023 (installation: "procedures for setting up equipment for use or service"); *IBM* at 344-345 [install] ("(1) to add a program, program option, or software to a system in such a manner that it is runnable and interacts properly with all affected programs in the system.").

Accordingly, NetRatings' construction should be adopted by the Court.

**4.** ***stored in memory of said computer machines; stored in an associated user computer machine; storing each of the events in said log in the local computer memory of said user computer systems; storing said log of predetermined events by each use meter in an associated user computer machine; stores said log of predetermined events***

With respect to "stored in memory of said computer machines," ('510 patent, claim 1) and "stored in an associated user computer machine" ('680 patent, claim 1), each of these terms refers to storing the log of events.  *See* '510 patent, claim 1; '680 patent, claim 1.  These terms are readily understood upon reading the claim language and should be construed as "placed in memory of the user computer on which the local computer use meter is installed" and "placed in memory or on a mass storage device in the user computer," respectively.  *See* JCCC rows 6 and 15.  With respect to the terms "storing each of the events in said log in the local computer memory of said user computer systems" ('510 patent, claim 11) and "storing said log of predetermined events by each use meter in an associated user computer machine" ('680 patent, claim 12), the proper constructions of such terms are "placing each of the events in the log in memory of the

user computer on which the local computer use meter is installed" and "placing the log of predetermined events logged by each use meter in the user computer," respectively.  *See* JCCC rows 10 and 19.  With respect to "stores said log of predetermined events" ('680 patent, claim 1) (JCCC row 17), NetRatings does not believe any construction of this term is required as its plain meaning is apparent.[8]

NetRatings' constructions of the foregoing terms afford the proper scope to the claims based on the language used in the claims with respect to where storing occurs.  Other than as indicated in the claim language, these terms should not be construed to require storage in a particular location.  For instance, while one claim term specifies storing "in memory," another claim term specifies storing in "local computer memory," and still other claim terms do not recite "memory" at all, but recite simply "stores" or "stored in an associated user computer machine." *Compare, e.g.,* '510 patent, claim 1 (JCCC row 6) with '510 patent, claim 11 (JCCC row 10) as well as with '680 patent, claim 1 (JCCC rows 15 and 17).

Contrary to Zango's proposed constructions, neither the claims nor the specification require that storage be on or utilize a particular type of memory device or location, and there are other possibilities beyond permanent memory or hard drives.[9]  *See, e.g.,* JCCC row 6 (Zango's construction reciting "non-volatile memory (e.g., hard drive)").  Indeed, "memory" may include

---

[8]  NetRatings notes that Zango's proposed construction of the term store itself appears inconsistent.  Specifically, in some terms Zango purports to construe the word store but uses two different words.  *See, e.g.,* JCCC row 6 ("store" equates to "contain") with JCCC row 10 ("store" equates to "copy").  To the extent that the Court determines to construe the word "store," NetRatings' construction (as reflected in its constructions of other terms) is "placed in."

[9]  *See e.g.,* '510 patent, col. 1, line 65 - 67 (describing that messages may be recorded in a log file and not limiting the type of memory or memory device used to record the messages); '510 patent, col. 3, lines 44 - 47 (describing that the use of software applications may trigger event messages in the operating system that may be recorded though not limiting the recording to a type of memory); '510 patent, col. 4, lines 18 - 19 (describing the recordation of titles of windows and not limiting the recordation to a type of memory); '680 patent, col. 3, lines 51 - 57 (describing storing information input by a user and not limiting the type of memory or memory device used to store the information); '680 patent, col. 4, lines 51 - 53 (describing recording titles of windows and not limiting the type of memory or memory device used to store the recorded titles); '680 patent, col. 8, line 24 - 28 (describing the format used by the log file to store data and not limiting the type of memory or memory device used to store the data).

both volatile memory (memory that does not persist in the absence of power) and

nonvolatile/permanent memory (memory that persists despite a lack of power), as both are

capable of providing for the storage and retrieval of data.  *See IBM* at 506 [permanent memory],

*Microsoft* at 360-361 [permanent storage]; *McGraw-Hill* at 2141[volatile memory], 1358

[nonvolatile memory].  Zango's improper attempt at restricting the claims should be rejected and

NetRatings' constructions should be adopted by the Court.

> 5.      *identify titles of open windows and reflects a log of titles of worldwide web pages; identify titles of windows and worldwide web pages*

NetRatings' proposed constructions of the foregoing terms are, respectively, "contains

characters identifying open windows and reflects a record of characters useful in identifying world

wide web pages" and "contain characters identifying windows and world wide web pages."  JCCC

rows 7 and 12.  A preliminary dispute between the parties regarding these two terms is whether

they should be construed identically, as proposed incorrectly by Zango.  *See* JCCC rows 7 and 12.

NetRatings' constructions properly distinguish between the terms to account for the difference in

the claim language: the first term specifies that the windows are "open," whereas the second term

does not.

The remaining parts of these terms overlap, and thus, are treated together.  NetRatings'

constructions are consistent with the specifications and the ordinary meaning of the words in the

phrases.  For the word "titles," NetRatings' construction relies on the intrinsic evidence which

explains that the function of the titles is to identify applications being used and web pages being

accessed.  *See, e.g.,* '510 patent, col. 4, ll. 11-63 ("[w]indow titles" of applications "generally hold

useful descriptions of the activity at that moment").  *See also* '510 patent, Response to Office

Action, 12/26/96, pp. 3-4, App. Ex. I, at A1174-1178 (the object of the logging of titles is to

*identify what the user is doing on the computer* by identifying, *for example*, "any world wide web

pages which are being used by the user") (emphasis supplied).  NetRatings' constructions are also supported by the ordinary meaning of the word "title."  *See, e.g., MW* at 758 (a "distinguishing name"); *Webster's II* at 1157 ("an identifying name" or a "general or descriptive heading").

Zango's constructions go too far in requiring that the titles comprise the "full names" of open windows "as they appear in the window's title bar" and the "full names" of worldwide web pages visited by the user.  JCCC rows 7 and 12.  No such requirements are supported by the intrinsic evidence and thus Zango's constructions should be rejected.

As NetRatings' constructions adhere to claim construction principles established by the Federal Circuit, they should be adopted by the Court.

### 6.    *identifies character strings reflecting on-line activity*

NetRatings' construction of this term from the '680 patent reflects its ordinary meaning, as confirmed by the specification: "identifies a group of characters that reflect activity performed on-line."[10]  For instance, the specification describes how the meter monitors character strings which can indicate URLs and identify the location of resources such as web pages.  '680 patent, col. 2, ll. 41-50.  This is also consistent with the ordinary meaning of the words.  A character string is a group of characters.  *See McGraw-Hill* at 350 (character string is "a sequence of characters").  The remainder of the term explains what the character string reflects – activity performed on-line.

Zango's construction requires that the group of characters "uniquely indicate online activity."  JCCC row 16.  The addition of the word "uniquely" is not supported by the intrinsic evidence and adds a wholly unnecessary ambiguity to the claim element which defeats the purpose of construing claims in the first instance.

---

[10]  NetRatings submits that no construction of this phrase is actually required and that the claim language is readily understandable as written.  Accordingly, NetRatings would propose, in lieu of construction, that the Court simply use the claim language itself.

Accordingly, the Court should either adopt NetRatings' straightforward construction for this term, which is consistent with the intrinsic evidence, or find that no construction is required.

### 7.    *dictionary/dictionary file*

The "dictionary" of the '510 patent is described in one embodiment as data used to interpret the information collected by the meter for reporting purposes. *See* '510 patent, col. 5, ll. 28-34. The appropriate construction of "dictionary" in the context of the patent is "a database or file containing entries used to interpret or correlate data." NetRatings' construction is fully supported by the specification, file history and the ordinary meaning of the word in the computer science context which clarifies the meaning of the term in this context as distinct from its colloquial meaning, e.g., a book of definitions. *See, e.g.,* '510 patent, col. 5, ll. 27-40 (dictionary is provided to "interpret" data from logs); Fig. 1 (dictionary shown as a database); App. Ex. I, at A1174-1178 ('510 patent, Response Under 37 C.F.R. §1.111 to Office Action, 12/26/96, p. 4 (dictionary assists in "interpretation of the event logs")). *See also The New IEEE Standard Dictionary of Electrical and Electronics Terms* (Christopher J. Booth ed., 5th Ed. 1993) ("*IEEE*"), Salmon Decl. Ex. 9, at 342 (dictionary defined as a "list of data items and information about those items, used both to describe and to reference the items").

There are several flaws with Zango's construction of the term dictionary. In the first instance, Zango requires that the dictionary be a file. JCCC row 8. However, this construction reads express claim language out of the claims. That is, claim 11 of the '510 patent specifies a "dictionary," whereas claim 9 of the '510 patent specifies a "dictionary file." To say that the dictionary must always be a file would improperly eliminate this distinction. *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) ("claim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous"). In addition, Zango's construction would

require that the dictionary be "customizable." JCCC row 8.  This limitation is not required by the intrinsic evidence or the ordinary meaning of the term.  While the specification refers to customizing the dictionary, it does not state that the dictionary must always be customizable.

For the foregoing reasons, NetRatings' construction of the terms dictionary and dictionary file should be the order of the Court.

**8.      *transferring said stored events from said plurality of user computer systems to a processing station computer***

The parties' disagreement with respect to the foregoing term is simple -- Zango incorrectly construes "said stored events" as meaning "the log of machine operation events."  JCCC row 11.  However, the language of the claim is clear -- what is transferred are the stored events.  Whether the events are in the form of a log or otherwise is not specified in the claim, and there is no reason to add a specific limitation otherwise.[11]  Accordingly, NetRatings' proposed construction of this term should be adopted and Zango's unduly limiting construction rejected.

**9.      *correlates said titles to identifiable labels***

One function of the claimed dictionary of the '510 patent is that it "correlates said titles to identifiable labels."  '510 patent, claim 11.  Zango incorrectly contends that the term is indefinite.[12]  JCCC row 13.  To the contrary, the term is straightforward and easily understood by

---

[11]  It is possible that Zango's contention is premised on the fact that the next step of the claim specifies "loading said event logs into memory associated with said processing station computer."  '510 patent, claim 11 (at col. 11, ll. 3-4).  However, that event logs are loaded into memory at the processing station does not necessitate that the processing station receives events as logs, or only as logs.  In an embodiment, the events could be received and then logs created or recreated for loading.

[12]  Although NetRatings addresses Zango's argument in this regard, it is inappropriate to make validity determinations during claim construction.  In *Phillips*, the Federal Circuit made clear that validity analyses, such as construing a claim term to preserve validity, should only be performed after "applying all available tools of claim construction" and then determining "that the claim is still ambiguous."  *Phillips*, 415 F.3d at 1327.  *See also Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1376 (Fed. Cir. 2005), *quoting Phillips* (same).  Similarly, in *StairMaster Sports/Medical Prods. v. Groupe Procycle*, the District Court of Delaware noted that the "[t]he Federal Circuit Court of Appeals . . . continues to draw a line between claim construction issues and issues of infringement and invalidity."  *StairMaster Sports/Medical Prods. v. Groupe Procycle, Inc.*, Case No. 97-396 MMS, 1998 WL 290296, at *2 n.5 (D. Del. May 20, 1998).  Thus, not only does precedent discourage validity determinations during claim construction, but

one of ordinary skill in the art based on its common, ordinary meaning.  Though construction is unnecessary, the term may be phrased as "correlates titles to labels identifiable for reporting," as NetRatings proposes.  JCCC row 13.  This construction is aligned with the ordinary meaning of the terms and one of the objectives of the '510 patent and finds full support in the specification.  *See* '510 patent, col. 5, ll. 6-8 ("system is provided to collect, process and deliver information regarding use of personal computer resources"); col. 5, ll. 54-56 ("system may generate reports showing information derived from the data base elements maintained," many of which elements are described in the column reference indicated).  *See also* '510 patent, Fig. 1 (wherein "identified usage data" is specified at 15 in the Figure and at col. 5, l. 45).

The specification of the '510 patent describes several examples of "identifiable labels," such as the label "S" which "identifies the file size of an application;" the label "T," which "identifies the Windows title of the application;" and the label "D," which "identifies miscellaneous data, typically the full path of the application."  '510 patent, col. 9, ll. 41-45.  The specification notes that "[o]ther labels and information could also be logged."  *Id.*

As discussed above, the term "correlates said titles to identifiable labels" is not indefinite, finding support in the claims and specification of the '510 patent.  Accordingly, Zango's position as to this term should be rejected and, to the extent the Court determines construction is required, NetRatings' construction of the term should be adopted.

---

states that departure from the precedent may only be with the aim of upholding validity of the patent.  Accordingly, Zango's improper attempt to have this Court rule on validity issues during claim construction should be rejected.

**B.    Terms From the '155 Patent**

**1.    *resource***

Described generally, the '155 patent concerns the collection of data regarding use of and interaction with a resource.  The word "resource" covers a broad range of meanings that may be summarized as 'things that can be used.'[13]  NetRatings' proposed construction follows the Federal Circuit's mandate and focuses on the types of resources that relate to the context of the '155 patent (the computer context).  NetRatings provides just a few examples to illustrate the types of resources that might be involved (*e.g.*, Web pages, parts of Web pages, images, ad banners, or games).  *See, e.g.,* '155 patent, col. 5, ll. 14-17; col. 7, ll. 6-12; col. 8, ll. 7-11; col. 13, ll. 52-61.  In contrast, Zango has arbitrarily selected one of the exemplary resources identified in the specification as its construction.  JCCC row 20.  Reading examples from the specification is contrary to Federal Circuit rulings.  *See, e.g., Phillips,* 415 F.3d at 1323.  Accordingly, NetRatings' construction should be adopted by the Court.

**2.    *executable program; executable program not being part of the resource***

The term "executable program" means a "computer program that can be run on a computer." This construction is consistent with the patent and the ordinary meaning of the term.  *See, e.g.,* '155 patent, col. 5, ll. 27-48 (executable program "runs" on clients or servers).  *See also Microsoft* at 182 (executable program is a "program that can be run").  Zango's construction is similar to NetRatings' construction, but Zango adds the explanatory phrase "(i.e., not source code)."  JCCC row 21.  In

---

[13]  *See, e.g., Microsoft* at 408 ("1. Any part of a computer system or a network, such as a disk drive, printer, or memory, that can be allotted to a program or a process while it is running. 2. An item of data or code that can be used by more than one program or in more than one place in a program, such as a dialog box, a sound effect, or a font in a windowing environment."); *IBM* at 577 ("(1) Any of the data processing system elements needed to perform required operations, including storage, input/output units, one or more processing units, data, files, and programs" and "(2) Any facility of a computing system or operating system required by a job or task, and including main storage, input/output devices, processing unit, data sets, and control or processing programs."); *Webster's II* at 944 (resource: "1. Something that can be looked to for support or aid.  2. An accessible supply that can be withdrawn from when necessary."); *MW* at 629 (resource: "1: a source of supply or support").

addition to the fact that this negative attribute -- the executable program not being source code -- is nowhere to be found in the claims, specification or file history, Zango misses the mark of the exercise of claim construction: to determine the meaning of the claim terms, not what the claim terms do not mean.  Zango's proposed construction also inappropriately incorporates an ambiguous phrase of "can itself" run.  It appears that Zango is attempting to limit the claim to a program which runs independent of any other program or code on a computer.  Such a limitation is not supported by the intrinsic evidence and, in fact, would exclude a preferred embodiment.  *See, e.g.*, '155 patent, col. 8, ll. 36-59.

The term "executable program not being part of the resource" simply refers to an "executable program not contained within the resource."  The executable program may, however, be embedded in the resource.  *See, e.g.,* '155 patent, col. 8, ll. 13-59; col. 9, ll. 9-16; col. 10, ll. 27-67; col. 11, ll. 2-19.  *See also* '952 patent, Attorney's Statement in Support of Petition to Make Special Under 37 CFR §1.102(d), p. 11, App. Ex. D, at A0154-170 (program is "linked to an HTML document and is downloaded and executed on a client when the HTML document is served to the client").  Zango construes this term to mean that the executable program cannot be associated within or embedded within the resource.  JCCC row 22.  While the phrase "associated within" is unclear, to state that the executable program cannot be embedded within the resource would improperly read the claim to exclude the embodiments of the invention.  *See,* '155 patent, col. 8, ll. 36-59.

NetRatings' constructions for the terms "executable program" and "executable program not being part of the resource," which are consistent with the intrinsic evidence and comply with the mandates of the Federal Circuit, should be adopted.

### 3.   *client identifying indicia*

The term "client identifying indicia" means "any information that can be used to associate data with a client."  This construction follows the specification of the '155 patent.  For example,

the patent discusses an object of the invention as creating a database of details of user interaction

with resources.  Such a database might include resource information, such as "IP

address[es]"combined with client information, such as "client IDs" or "cookies."  '155 patent, col.

4, ll. 29-37.  Examples of client identifying indicia include "a user's network ID (IP) and client ID

numbers (cookies)."  '155 patent, col. 11, ll. 20-24.  Zango's construction of this term as "any

information that can be used to identify the client" (JCCC row 23) is incorrect in so far as it reads

out express claim language – indicia does not require that the information specifically identify the

client, rather the indicia may be used to associate data with a client.

**C.      Application of 35 U.S.C. § 112(6) to Claim 9 of the '510 Patent**

Claim 9 of the '510 patent contains a means-plus-function element subject to 35 U.S.C. §

112(6): "means for interpreting the logged machine operation events by reference to the dictionary

file."  JCCC row 9.  In construing means-plus-function elements, the function of the element is

first determined, and then the corresponding structure for performing the function, as described in

the specification, is identified.  *See WMS Gaming Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1347

(Fed. Cir. 1999).  In the context of claim elements in which the disclosed structure is a computer,

the structure for such claim elements is the computer, programmed to perform the algorithms

disclosed in the specification.  *See, e.g., WMS Gaming,* 184 F.3d at 1349 ("In a means-plus-

function claim in which the disclosed structure is a computer, or microprocessor, programmed to

carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the

special purpose computer programmed to perform the disclosed algorithm.").  In accordance with

*WMS Gaming*, reference may be made to the patent specification to identify the specific

algorithms which the computer code is programmed to perform may be done with explicit

reference to the specification and/or figures, or by reference to column and line numbers.

*McKesson Info. Solutions LLC v. The Trizetto Group, Inc.,* 426 F. Supp. 2d 197, 202 (D. Del.

2006) (identification of structure includes identifying "the specific algorithm disclosed in the specification, or where it is disclosed (or otherwise inferred)").

With the foregoing principles in mind, NetRatings has identified the proper function as stated in the claim itself, "interpreting the logged machine operation events by reference to the dictionary file." JCCC row 9.  The structure described for performing this function is "a processing system programmed to perform the recited function" of "interpreting the logged machine operation events by reference to the dictionary file." *Id.*  NetRatings has cited to portions of the specification which describe the structure performing the claimed function.

Zango's assertion that the "structure is not identified" for the abovementioned claim term ignores explicit descriptions in the '510 patent.  For example, the '510 patent describes that "a central processing system" "may assimilate many local personal computer use logs" and "translate the log information into useful information."  '510 patent, col. 2, ll. 64-66.  Similarly, the '510 patent describes that "[t]he central processing station" may "create a customized data dictionary," which may be used to "interpret the raw data provided by the event log files."  Consequently, the '510 patent clearly recites structure for the foregoing element.

## <u>CONCLUSION</u>

For all the reasons stated above, NetRatings requests that the disputed claim terms be construed in the manner proposed by NetRatings in the Joint Claim Construction Chart.

Dated: April 27, 2007                    Respectfully submitted,

**DREIER LLP**

By: /s/ Seth H. Ostrow
    Seth H. Ostrow (SO 9605)
    Arianna Frankl (AF 7764)
    Timothy M. Salmon (TS 7348)

499 Park Avenue
New York, New York 10022
(212) 328-6100

Attorneys for Plaintiff NetRatings, Inc.

## DECLARATION OF SERVICE

I, Timothy M. Salmon, declare that on the 27th day of April 2007, I caused a true and correct copy of NetRatings, Inc.'s Opening Claim Construction Brief, to be served upon the following persons in the manner indicated.

*By Electronic Mail*:

Richard S. Mandaro
rmandaro@ARELAW.com

Ramsey M. Al-Salam
ralsalam@perkinscoie.com

Ryan J. McBrayer
rmcbrayer@perkinscoie.com

Attorneys for 180solutions, Inc. and Zango, Inc.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of April 2007 at New York, New York.

<u>        /s/Timothy M. Salmon        </u>
Timothy M. Salmon

249381

26